## PAINE v. ELECTRICAL RESEARCH PRODUCTS, Inc.

District Court, S. D. New York.
April 22, 1939.

Gilbert & Gilbert, of New York City (A. S. Gilbert, Francis Gilbert, and Godfrey Cohen, all of New York City, of counsel), for plaintiff.

T. Brooke Price and Homer H. Breland, both of New York City (Homer H. Breland and T. Brooke Price, both of New York City, and Edward A. Sargoy, of New Rochelle, N. Y., Esqs., of counsel), for defendant Electrical Research Products, Inc.

Julian T. Abeles, of New York City, and Herman Finkelstein, of New York City, for defendants Metro-Goldwyn-Mayer Corporation, Twentieth Century Fox Film Corporation, Columbia Pictures Corporation, and Universal Pictures Co., Inc., and United Artists Corporation.

KNOX, District Judge.

Paine, the plaintiff, is the agent for numerous composers and sheet music publishing houses. In such capacity, he has sued the defendant for $211,743.56 allegedly due him under the terms of a contract between his predecessor in office and the defendant.

Defendant, a subsidiary of the Western Electric Corporation, is engaged in the business of renting or selling devices to be used in the recording and reproduction of sound in the manufacture and exhibition of motion pictures. Desiring to make available to its licensees numerous musical compositions and arrangements owned by composers and publishers in the United States and Canada, defendant entered into a licensing agreement with plaintiff's predecessor under date of September 5th, 1927. The terms of this arrangement permitted defendant, or its licensees, to record and reproduce in theatres in the United States and Canada musical compositions to which the plaintiff's principals held domestic copyrights. With the subsequent increase in the demand for sound pictures, a world market was opened, and the parties found it desirable to expand the privileges authorized by the original agreement. The contract with respect to which the present dispute arose, is dated July 29th, 1929, and was designed to cover problems growing out of the widening field of defendant's operations. For the purposes of differentiation, the parties have designated the second contract, the "foreign agreement."

This instrument recites the making of an original contract and contains the following clause: "Whereas, the Licensor represents that his Principals own or control, or have the right to grant licenses, as hereinafter set forth in respect of said copyrighted musical compositions, including all rights of the character herein granted and agreed to be granted, and that he, the said Licensor, has full authority to represent and bind his Principals in the granting of the rights and licenses, and in making the agreements herein contained:"

The first paragraph of the first article of the agreement reads as follows: "First: —The license herein granted and agreed to be granted, is to the extent and for the purpose hereinafter stated, under all copyrights and rights to grant licenses in respect of musical compositions which are now owned or controlled, or which hereafter, during the term of this agreement, may be owned or controlled by the Licensor's Principals, or any of them, or with respect to which they, or any of them, may now or hereafter have the right to grant licenses."

The second article thereof sets forth that the licensor has granted to the licensee the right and license

"(a) To record said musical compositions, or any of them, in any manner, medium or form in any country covered by this license but only in synchronization with motion pictures, or titles or other explanatory matter to be screened in direct connection therewith except that said musical compositions may be recorded for use as overture, entr'acte and exit music but only in connection with the specific motion picture for use with which they were originally recorded;

"(b) To make copies of recordings in any such country;

"(c) To import recordings and/or copies of recordings made in the United States and/or Canada, into any of the countries of the world covered by this license;

"(d) To produce and reproduce said musical compositions publicly, subject to Paragraph 'Eighth' hereof, and to use, lease and sell recordings and copies thereof, but only for the purpose of reproduction of sound by apparatus operated or controlled

through the agency of said recordings or copies thereof;

"(e) To grant sub-licenses hereunder subject to the exception that no sub-licenses may be granted to any person, firm or corporation not engaged in producing motion pictures or recording music for use in synchronization therewith, and subject to the further exception that sub-licenses for recording in countries foreign to the United States and Canada may be granted only to American and Canadian producers of motion pictures or American and Canadian companies engaged in recording music for use in synchronization with motion pictures. No sub-license shall be granted for the purpose of making or vending non-synchronous phonograph records, except as for specific overture, entr'acte and exit music purposes as provided in paragraph (a) of this section."

None of plaintiff's principals, it turns out, owned the foreign rights to each and every composition to which some of them held the domestic rights. So far as foreign countries are concerned, a number of these compositions seem to have been in the public domain, and the parties have stipulated that the plaintiff is not entitled to recover anything on his second cause of action on the basis of his principal's ownership of foreign copyrights. Plaintiff predicates his right to recover upon the theory that the contract gave the defendant the privilege of exporting recordings from the United States and Canada and that, having exercised such right, the compensation which the defendants agreed to pay is not dependent upon the foreign copyright status of the compositions. Defendant, on the other hand, claims the contract grants a right to import a recording into a foreign country, and that compensation therefor shall be paid only to the extent that foreign copyrights are held by plaintiff's principals.

In addition to this dispute, the parties have long been in controversy over the measure of compensation to be paid for the use of certain recordings which the defendant admits were covered by paragraph "Eleventh" of the agreement. This paragraph, which the parties have subjected to opposing interpretations, is the so-called "only" clause of the contract, and it reads as follows:

"Eleventh.—Licensee agrees to pay Licensor for the license hereby granted, in the following sums:

"Seventy-five dollars ($75) for each entire use, as hereinafter defined, and Thirty-seven dollars and fifty cents ($37.50) in respect of each partial use, as hereinafter defined, of each musical work which is used by Licensee under this license.

"Provided, however, with respect to music recorded in connection with productions which have been exhibited in any country covered by this agreement prior to the date thereof; that in the event said work is used only in any of the English-speaking countries (other than the United States and Canada), the amount payable by the Licensee to the Licensor, shall be forty-two per cent (42%) of said amounts; in the event said work is so used only in any of the so-called Latin countries of Europe, the amount payable by the Licensee to the Licensor shall be fourteen percent (14%) of said amounts; in the event said work is so used only in any of the countries of Europe other than the Latin countries, the amount payable by the Licensee to the Licensor shall be nineteen percent (19%) of said amounts; in the event said work is so used only in any of the South American countries, the amount payable by the Licensee to the Licensor shall be sixteen percent (16%) of said amounts; in the event said work is so used only in any of the remaining countries of the world, other than above, outside of the United States and Canada, the amount payable by the Licensee to the Licensor shall be nine percent (9%) of said amounts; provided further, with respect to music recorded in connection with productions which are first exhibited in any country covered by this agreement on or after the date hereof, that in the event said work is used only in any of the English speaking countries (other than the United States and Canada) the amount payable by the Licensee to the Licensor shall be fifty percent (50%) of said amounts and in the event said work is used only in any of the countries than the English speaking countries the amount payable by the Licensee to the Licensor shall be fifty percent (50%) of said amounts; and provided further, that in no event, however, shall a payment be at the rate of less than Thirty-seven dollars and fifty cents ($37.50) in the case of entire use as above, or Eighteen dollars and seventy-five cents ($18.75) in the case of a partial use as above, where full world rights are available hereunder. Schedule "C" hereto attached, more particularly notes the coun-

tries aforesaid in their respective groupings for the purpose of the above percentages.

"It is understood and agreed that the foregoing payments shall be due and payable even though but one performance be given in a theatre or place of public entertainment in any given country or group of countries, as the case may be, as aforesaid.

"For the purposes of this agreement, 'entire' or 'partial' use shall be defined as follows:

"(a) By 'entire use' it is understood and agreed shall be meant the full melodic content or a total of bars equal in number to those constituting the full melodic content;

"(b) By 'partial use' it is understood and agreed shall be meant any use less than an 'entire use' as defined in paragraph (a);

"(c) 'Full melodic content' as used in paragraph (a), it is understood and agreed, shall be deemed to mean the composition as published, even though minus the introduction, coda and repeats, if any, but the use of the introduction, coda and repeats, if any, or any of them, with the melodic content, shall not be deemed to increase the extent of a given use as defined in paragraph (a)."

Plaintiff takes the position that if defendant used any compositions recorded in connection with productions first exhibited prior to July 29th, 1929, in any two countries in which specified languages are spoken, plaintiff became entitled to 100% of the fee fixed in the contract. Defendant's interpretation is that it could use a composition in as many different groups of countries as it desired, and was then required to pay plaintiff the sum of the respective percentages attributable to these separate groups. Defendant thus maintains that a composition must have been used at least once in each group before 100% of the fee became due.

The dispute revolves about a play on the word "only" in each of the instances in which it occurs in the contract. For example, could there be a use "only" in a Latin speaking country and also a use "only" in an English speaking country?

Having regard for what, apparently, was in the minds of the parties at the time the contract was made, it would seem that plaintiff's interpretation of its right to compensation with respect to compositions on which his principals held copyrights in the United States and Canada, but which are in the public domain abroad, is far more reasonable than is the contention of defendant. In this connection, it should be observed that plaintiff does not claim compensation for the use of compositions on which other persons held foreign copyrights.

The services of outstanding artists were readily available only within the United States and Canada and, since the recordations could not be imported into a foreign country without their first having been exported from the place of manufacture, there is little or no reason for not concluding that the right to "import recordations" into foreign countries was the full equivalent of the right to export them from the United States and Canada. To this line of reasoning, defendant declines to give assent.

The argument is, that, inasmuch as the contract with the exception of one clause, contains no provision expressly licensing the export of recordations, but refers specifically to their importation into foreign countries, defendant had full liberty of free use of American and Canadian recordations in any foreign country in which none of plaintiff's principals could claim a valid copyright. Defendant seems not to have been of this mind at the time it entered into the foreign agreement.

Aside from any doubt it may have had as to the right to export an American or Canadian made recording, which right it desired very much to have, it was also confronted with the problem of dealing with a mass of copyright statutes, both American and foreign. Upon coming into possession of such rights as were owned or controlled by plaintiff's principals, whether here or abroad, many of the business risks incidental to the foreign exploitation of its recordings, would be eliminated. In other words, the foreign agreement effectively foreclosed plaintiff from raising any question as to defendant's right to use the compositions in foreign lands. Had it not been for the agreement, defendant would have been put to the necessity of determining the exact copyright status of a multitude of musical compositions which it wished promptly to use and the use of which, in the absence of agreement, might possibly subject it to consequences of a serious nature.

Defendant's present contention flies in the face—not only of the commercial, but

also the artistic—purposes that were sought to be served by means of the foreign agreement. Without plaintiff's consent, recordations within the United States and Canada could not lawfully be made, and were wholly unfeasible. The suggestion that defendant, as to these recordations, was to have a free gift of the property rights of great value, is simply repellant to the ideas upon which business is transacted. I shall hold, therefore, that upon each occasion on which defendant exported and used in a foreign country the recordations of compositions on which plaintiff's principals held domestic or Canadian copyrights, and which were in the public domain abroad, defendant, according to the terms of the agreement, became obligated to pay the stipulated compensation for such use as was made of the compositions.

■ As holders of domestic copyrights, plaintiff's principals could have refrained from licensing at all, contenting themselves with the right of excluding others from the use of their property. Fox Film Corp. v. Doyal, 1931, 286 U.S. 123, 52 S.Ct. 546, 76 L.Ed. 1010.

The evidence shows clearly that throughout the course of the contract, plaintiff has consistently asserted the position for which he now contends. Upon the stand, he testified he had made his position clear at the outset and in this is corroborated by Mr. Pratt, a witness called by defendant. Mr. Paine also testified that, in view of his position as a fiduciary and the consequent difficulty of his regaining any payments which might be turned over to his principals, he had agreed not to insist upon immediate payment for the use of compositions which the defendant stated to be in the public domain but reserved his rights until a future reckoning and accounting should be made. This circumstance gives understanding to Mr. Paine's actions of agreeing to cancel export permits and make refunds in all instances in which defendant asserted that a recording which had been exported, or which was about to be exported, was in the public domain abroad.

■ Part of the defendant's case is rested upon the so-called warranty clause of the contract, set forth supra. In this aspect of the case, argument is made that plaintiff has failed to allege and prove performance of the warranty covenant in that it has not shown any control of foreign copyrights. This contention might have

substance were it the fact that the clause actually warranted that plaintiff's principals held or controlled foreign copyrights to all the compositions covered by the agreement. The evidence before the court, taken in connection with the conclusion that the agreement granted a right to export recordings in the United States and Canada, does not justify the interpretation which defendant puts upon the warranty clause. At most, the licensor represented that his principals held United States and Canadian copyrights upon all the compositions and had a right to grant defendant a license to export recordings made therefrom. The form of this export license, for which provision was made in the agreement itself, includes the statement that the licenses issued under the agreement "are warranted valid for all countries covered by said agreement * * *" and, so far as the record shows, defendant has had an uninterrupted use in foreign countries of the compositions with which the present dispute is concerned. Thus it would appear that there has been a fulfillment of any obligation assumed by plaintiff to defendant, since, as a corollary to the warranty of an export license, as set forth in the agreement, and in the license form, there is an assurance that no one had power to prohibit defendant from importing into or using these compositions in foreign countries.

As previously pointed out, the construction of paragraph "Eleventh", the so-called "only" clause, concerns nothing more than the method of computing the compensation for the use of compositions which defendant admits to have been covered by foreign copyrights.

■ In my opinion, the plaintiff has been paid all that was due to it for recordings synchronized with pictures first exhibited prior to the effective date of the agreement. From all the evidence, it would seem that it was the intention of the parties, as expressed in paragraph Eleventh, that these recordings should be paid for on the basis of a certain percentage of the base rate for every use within each of the five groups of countries. First of all, I do not think it was a mere coincidence that the sum of the percentages attributable to each of the groups equals 100% of the basic rate of compensation. This hardly would be true if, as the plaintiff contends, use in any two groups would entail liability for 100% of the fee. Secondly, plaintiff's contention would lead to the rather absurd

conclusion that defendant had agreed to pay more for compositions used in connection with old pictures than in the case of compositions used in conjunction with more modern productions.

Under plaintiff's construction, a use in France and Germany, in connection with a picture first exhibited prior to 1929, would entail liability for 100% of the fee, whereas if the picture was first exhibited after 1929, the defendant would have to pay 50% of the fee. It seems unreasonable that defendant would have made an agreement such as this, when recordings made and used prior to the date of the agreement were far less valuable than recordings made and used after that date.

Finally, the testimony shows that plaintiff acquiesced in the position taken by defendant, and that the construction of the agreement which is set forth in this suit, is not that which first was adopted. On June 17, 1932, defendant wrote plaintiff with respect to a royalty payment received for the use of a certain composition, as follows:

"I also wish to point out that the first showing of this production took place in Australia, on April 20th, 1929, and has been shown in England, German speaking countries and Egypt only. Your second billing therefore, should only have covered 20% instead of 50%. * * *

"For your information, reference to our records reveals that on the basis of the first showing previously reported to us, 100% payment has been made for this production on the 50-50 basis. On the basis of first showing report just furnished us by Vitaphone, payment for this production would be computed on the group basis, e. g. —
42% —English speaking countries
19% —Central Europe and
9% —Rest of the world (Egypt), a total of
70% due instead of 199% paid, or a difference of $585.00"

On September 2nd, 1932, the plaintiff replied to this letter as follows:

"I have your letter of August 26th, 1932, in reference to the 'Land of the Silver Fox' and other correspondence relative to the same and would advise you that in the light of all the circumstances I cannot find any valid reason to advance why adjustment should not be made on the payment which has been made in connection with this particular picture.

"I understand that you will make this adjustment in connection with the next foreign distribution."

On September 28th, 1932, defendant again wrote plaintiff and requested that an adjustment be made on payments made in connection with five different pictures which, it had discovered, had first been exhibited prior to July 29, 1929. The plaintiff replied: "In reply to your letter of Sept. 28th, 1932, setting forth several productions which Warner Brothers asked to have adjusted, would say, in answer to your letter, that I am of the same opinion as outlined in my letter to you of Sept. 2nd, 1932, in the case of the production 'Land of the Silver Fox.' "

For these reasons, I think defendant is entitled to prevail in its interpretation of paragraph "Eleventh" of the foreign agreement.

Judgment herein may be entered in accordance with the disposition of the controversies, as hereinbefore indicated.